**Robert Lee PIERSON, Sr., Appellant,**

v.

**STATE of Texas, Appellee.**

**No. B14–81–413–CR.**

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 5, 1982.

Discretionary Review Refused Nov. 3, 1982.

Lewis Dickson, Houston, for appellant.

Ray Elvin Speece, Houston, for appellee.

Before PAUL PRESSLER, MURPHY and ROBERTSON, JJ.

PAUL PRESSLER, Justice.

Appellant was convicted of murder by a jury and sentenced to eighty years confinement in the Texas Department of Corrections.

By his first ground of error, appellant complains that the evidence was insufficient to sustain his conviction.

The state's first witness was Lucy Mae Mitchell. She testified that the deceased, James Willie Baines, a 38 year old, mentally retarded, black male, was her nephew and had lived at her house for about one year prior to his death. Baines apparently had limited use of motor functions, particularly speech, and often communicated by some sort of sign language. According to Mrs. Mitchell, on the morning in question Baines walked to a nearby store to buy some snuff. On his returning, Mrs. Mitchell recalls last seeing Baines "outdoors around at the back." Later Mrs. Mitchell heard one gunshot from an unknown direction, and she ran to her front door. There she was met by Baines who was holding his chest. He ran past her into the kitchen. Mrs. Mitchell then noticed that Baines had been shot. In the kitchen Mrs. Mitchell asked Baines who shot him. Baines took some iron "eyes" off the kitchen stove and threw them in a manner which Mrs. Mitchell interpreted to be in the direction of appellant's house.

Mrs. Mitchell also testified that about two months before Baines was shot appellant tried to kick in her door and complained that some paneling was taken from his premises. She stated that appellant had a silver gun with a white handle, possibly a .38 caliber pistol, although she wasn't sure.

Willie Delro lived directly across the street from Baines with his mother-in-law, Mary Gaines. Delro testified that he was awakened by Mrs. Gaines at about noon on the date in question. According to Delro, as he was putting on his clothes, he heard three shots. Four or five minutes later, he looked out of his front door and saw appellant's wife leading the Pierson's white horse into appellant's back yard. He did not see Baines, but he did see the appellant standing on his front porch. Delro then observed Mr. Ignacio Trevino, another neighbor, heading from the vicinity of appellant's house. Delro believed that Mr. Trevino had some sort of package in his hands, perhaps a paper bag. Some fifteen or twenty minutes later, Delro said, Mr. Trevino left in his automobile with the other members of his family. During this period, Delro recalls seeing appellant standing on his front porch.

Mrs. Gaines testified that on the day in question she saw Baines standing in his

yard at about 11:20 a.m. She also noticed appellant and his wife talking to Mr. and Mrs. Trevino and their children in the Trevino's front yard. Mrs. Gaines went inside, watched television for a few minutes and then went to awaken Mr. Delro. Afterwards, she went into the bathroom. She then heard one shot, which came from the direction of appellant's house. Two or three minutes later, after returning to her living room and while seated on her couch, she looked over her shoulder and saw Baines running with his hands on his chest. At some point after the shooting Mrs. Gaines saw the appellant with a dark handled pistol in his back pocket. She testified that all she could see was the handle. Evidence was introduced that in 1978 some unknown person had shot and killed Mary Gaines' dog and had fired some shots at her house on Breeland Street.

Gisile Wafer testified that she lived in the house between Baines' and appellant's. On the day in question, she and a visitor, Sammy Elay, were sitting in her front yard visiting. They casually noticed both Baines and appellant at various times. The deceased was walking around in his front yard and appellant was working on a car on his own premises. At approximately noon, Wafer saw appellant go inside his house for about five minutes. Wafer testified that when appellant returned he began firing his pistol in the "opposite direction." Wafer and Elay immediately went inside the Wafer residence. As they sat in the living room, they heard more shooting from the direction of appellant's house and Wafer heard somebody moan. Looking out of the front door, Wafer saw Baines holding his chest and running towards the house where he lived. She also saw appellant walking his white horse from in front of the Wafer's house towards his house. At the time Wafer looked out the door, appellant was fifteen to twenty feet away from Baines. She did not see anyone else in their yards. According to Wafer, appellant was carrying a "silvery" pistol in his back pocket.

Kato Mitchell, Mrs. Mitchell's son and a first cousin of the deceased, testified that when he arrived at his mother's house, oth-

er people in the neighborhood told him that they believed appellant had done the shooting. He drove slowly by appellant's house in order to locate appellant's street number. As Mitchell drove by, appellant came out of his house and said: "I killed that nigger and I'll kill ya'll too". Mitchell also testified that he saw a gun in appellant's back pocket. He described the gun as being large with a black handle.

Brenda Joyce Mitchell, Kato Mitchell's wife, was in the car with her husband and offered similar testimony. She described the gun in appellant's possession as being shiny and silver.

Houston Police Officer Michael E. Harris testified that on November 2, 1979, the day following the shooting, he responded to a shooting-ambulance call on Breeland Street. At the time Officer Harris knew nothing of the shooting of the deceased. Appellant had been wounded by a shotgun blast and an ambulance had been summoned. Officer Harris found appellant lying on a stretcher in the ambulance. Harris saw no signs indicating that appellant's wound had been self-inflicted. While appellant was in the ambulance, Harris asked him if he was involved in a "squabble" with his neighbors, whereupon appellant remarked: "Yeah, I shot the damn nigger." Appellant would not respond to questions concerning who shot him.

Appellant's wife, Ina Lucille Pierson, testified that she was in her backyard when she heard what sounded like two shots coming from the front of her house. Mrs. Pierson testified that when she heard the shots, her husband was in their backyard with their neighbor, Mr. Trevino, looking for some equipment. The shots were not very loud and did not sound as though they came from a large caliber weapon. Mrs. Pierson testified that she had done some laundry that day for the Trevinos. Mrs. Pierson testified that she and her son had been shot on Breeland Street and her first husband was shot and killed in the neighborhood. Mrs. Pierson indicated that appellant owned three pistols, two .357 Magnums

and a .45 Magnum. Additionally, appellant's wife owned a .22 caliber pistol. Mrs. Pierson testified both .357 Magnums were silver in color. The .45 Magnum was black steel with black handles.

Ignacio Trevino testified that he walked across the street to have appellant's wife wash some clothes because his wife was ill. Appellant was doing some kind of work in his front yard. Sometime during the day, perhaps before the ambulance arrived, Mrs. Pierson returned the Trevino's clothes that she had laundered for them. Mr. Trevino heard no shots and indicated that he had been inside most of the day. After the ambulance arrived, Trevino and his family left their home and went for a doctor's appointment. They did not return until much later that afternoon. Trevino testified, in contradiction to the testimony of appellant's wife, that on the day of the shooting he had not been in back of appellant's house with the appellant and his wife when they heard gunshots.

On the afternoon of November 2, 1979, officers searched appellant's residence with the consent of his wife. As a result of a comprehensive search of the house, excluding the "junkyard", officers found the two .357 Magnums which appellant owned. The .22 caliber automatic pistol which belonged to appellant's wife was also found. None of these were taken into police custody. No .45 Magnum was found. Although the two .357 Magnums fit the general description of the suspected weapon as given by witnesses, they were not of the same caliber as the gun which fired the bullet that struck the deceased. The .22 caliber black steel automatic was not seized since not only did it not comport with the description of the weapon given by the witnesses, but also appeared not to have been fired recently.

Detective David S. Preece of the Houston Police Department testified that he questioned appellant at Ben Taub Hospital on November 2. Appellant denied any knowledge of the shooting of the deceased. Preece also testified that the persons to whom he had spoken concerning the shooting had described the gun seen in the possession of appellant as a silver gun with brown grips.

Officer C.E. Anderson, a Houston Police Department firearms examiner, testified that the bullet removed from the deceased was badly mutilated and could not have been compared to a weapon even if one had been recovered and submitted to him. He testified that there were various companies that made "adaptors" so that a weapon such as a .357 Magnum could be used to fire a .22 caliber bullet. There was no evidence, however, that appellant ever owned or possessed any such "adaptor".

Officer Danny J. Frisch, also of the Houston Police Department, testified that on November 1, 1979 at 12:30 p.m. he responded to a burglary call at appellant's residence. Frisch arrived at appellant's home within about fifteen minutes and was met by appellant's wife. She stated that her husband was busy in the back yard and told Frisch about a torch-cutting rig that had been taken sometime between the hours of 6:00 p.m. on October 31st and 10:00 a.m. of that day, November 1, 1979.

Through Dr. Eduardo Bellas, Assistant Medical Examiner of Harris County, Texas, the autopsy report of Dr. Ethel Erickson, who had performed the autopsy of the deceased, was offered into evidence without objection as State's Exhibit No. 1. It was Dr. Erickson's opinion that the deceased died as a result of a single gunshot would to his left chest. The bullet traveled from left to right and downward from front to back. There was no indication that the wound was caused by a "high velocity" missile. Bellas testified that wounds caused by bullets fired from a distance of less than twenty-four inches leave gun powder deposits around the wound. There were no such powder burns and therefore, the wound was probably one inflicted from a distance greater than twenty-four inches. Bellas also testified that he had no way of determining whether or not the bullet that killed the deceased was fired from a pistol or rifle, but it could have been a .22 caliber.

The State's case is built upon circumstantial evidence and the jury was correctly charged. Every case built on circumstantial evidence must be tested by its own facts to determine the sufficiency of the evidence. *Brasfield v. State,* 600 S.W.2d 288 (Tex.Cr.App.1980); *Indo v. State,* 502 S.W.2d 166 (Tex.Cr.App.1973). A conviction based on circumstantial evidence cannot be sustained unless the circumstances exclude every other reasonable hypothesis other than the guilt of the accused. Proof creating a strong suspicion or a mere probability is not sufficient. *Faulk v. State,* 608 S.W.2d 625 (Tex.Cr.App.1980); *Carlisle v. State,* 549 S.W.2d 698 (Tex.Cr.App.1977). It is not necessary, however, that every fact point directly and independently to the defendant's guilt. It is enough that the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Flores v. State,* 551 S.W.2d 364, 367 (Tex.Cr.App.1977). The test on appeal is whether there was evidence from which the jurors might reasonably conclude that every reasonable hypothesis was excluded other than the guilt of the accused. *Flores, supra; Nathan v. State,* 611 S.W.2d 69 (Tex.Cr.App.1981). The appellant argues that because other individuals in the area had been shot, that because no gun was ever found matching the description of the gun the appellant had at the time, that because appellant's statements that he shot "a nigger" were "equivocal" and that because there was no evidence of flight, the evidence was insufficient. We disagree. Gunshots were heard from the direction of appellant's house about noon on November 1; immediately thereafter moaning was heard and the deceased was seen running into his house holding his chest, mortally wounded. As the deceased ran toward his house, appellant was seen not more than fifteen or twenty feet from the deceased. Appellant had a pistol in his back pocket. Appellant admitted to investigating police on the evening of November 1 and on the following day that he had shot "a nigger". Appellant's alibi, through the testimony of his wife, was disputed by the testimony of his neighbor. The evidence is sufficient to sustain the conviction. The ground of error is overruled.

Appellant's second, third, fourth and fifth grounds of error all relate to the missing murder weapon. By his second and third grounds of error, appellant argues that he was denied due process of law and deprived of a fair and impartial trial because of the "false and unfounded theory that a .22 caliber pistol owned by appellant in 1971 was the murder weapon." By his fourth ground of error, appellant argues that he was denied due process of law when the prosecuting attorney failed to disclose evidence which was favorable to his defense. By his fifth ground of error, the appellant argues that the trial court abused its discretion in overruling the appellant's third amended motion for new trial based on the existence of the newly discovered evidence that the .22 caliber revolver which the prosecution had theorized was the murder weapon had in fact been destroyed approximately fifteen months prior to the shooting of the deceased. This entire series of grounds of error has some merit and causes this court concern.

In addition to the testimony set out above, Willie Delro testified that prior to decedent's death he had seen appellant carrying a silver colored gun but did not know its kind or caliber.

Ignacio Trevino testified that the only gun he had ever seen appellant carrying was a stainless steel .357 magnum revolver.

C.E. Anderson, a Houston Police Department fire arms examiner, testified that the Ruger Fire Arms Co. makes a .22 caliber revolver that looks similar to the appellant's .357 magnum revolvers. Anderson also testified that a .22 caliber bullet could be fired from a .357 revolver by use of an adaptor.

Appellant's major complaint concerns the testimony of appellant's wife, Ina Pierson, as a rebuttal witness for the State. The prosecutor asked Mrs. Pierson whether the appellant owned a .22 caliber Ruger revolver, Serial No. 7686. She said that if appellant had owned such a gun she had never

seen it and that she did not know if appellant had given away any guns.

At the hearing on appellant's third amended motion for new trial, it was established that the prosecuting attorney at the time of trial had in his possession Houston Police Department Offense Report No. 00749. This report pertained to a 1971 homicide investigation which resulted in a prior murder charge against appellant. This report described a .22 caliber revolver owned at that time by appellant as black steel with white grips.

During the State's jury argument at the guilt phase of the trial, the prosecutor stated:

> I submit to you that he [appellant] shot him [deceased] with his [appellant's] Ruger single-action .22 revolver, serial number, that his wife said he has never gotten rid of any of his guns that she knew of while he was married ... I submit to you that's obviously why the .22 single-action Ruger revolver was not around when the police came and the wife agreed for them to search the house.
>
> Obviously he's not going to keep the gun there. I don't know where it was on the property....
>
> We proved that he has been out in the front yard with one of his guns and nobody knows which one, they just know it is a big gun such as a Ruger single-action Western-style revolver is, just as big as a .357, in his front yard shooting....
>
> 'Big Robert' was right outside, right where Cookie [Gisile] Wafer said he was, in the front yard of the house with his gun, the large gun, the single-action Ruger .22.

The appellant contends that prosecutor "brushed over" discrepancies between the description of the guns and without justification injected before the jury the theory that appellant had a .22 caliber and subsequently disposed of it. Appellant cites numerous cases supporting his argument that he was denied due process of law and deprived of a fair and impartial trial because of the .22 caliber murder weapon theory. However, a careful reading of each reveals none that would require us to reverse this case. This Court will not hesitate to reverse a judgment when the prosecutor engages in conduct calculated to deny the accused a fair and impartial trial. However, a careful reading of the transcript does not disclose a willful and calculated effort on the part of the prosecution to deny appellant a fair and impartial trial. *Johnson v. State*, 604 S.W.2d 128 (Tex.Cr. App.1980). Appellant's second and third grounds of error are overruled.

■■■ By his fourth ground of error, the appellant alleges he was denied due process of law because the prosecuting attorney failed to disclose evidence favorable to the defense. This "favorable evidence" was the "material discrepancies between the description of the weapon as given by witnesses in the instant case and the prosecutor's 'theorized weapon.'" The standard to be applied is whether the omitted testimony may have had an effect on the outcome of the trial. *Smith v. State*, 516 S.W.2d 415 (Tex.Cr.App.1974); *Ransonette v. State*, 550 S.W.2d 36 (Tex.Cr.App.1976). The prosecutor has not violated his constitutional duty of disclosure unless his omission is sufficiently significant so as to result in the denial of the defendant's right to fair trial. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97 at 109–110, 96 S.Ct. 2392 at 2400, 49 L.Ed.2d 342 (1976).

The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial.

*United States v. Agurs, supra* at 112–113, 96 S.Ct. at 2401–2402 (1976); *Green v. State,* 587 S.W.2d 167 (Tex.Cr.App.1979). We cannot conclude that the evidence allegedly suppressed would have materially affected the determination of appellant's guilt or the punishment to be imposed or that the failure to disclose such evidence, under the circumstances here presented and the testimony given, was so prejudicial as to warrant a reversal.

By his fifth ground of error, the appellant argues that the trial court abused its discretion in overruling appellant's third amended motion for new trial based on the existence of newly discovered evidence. Appellant introduced a certified and exemplified copy of official records which unequivocally proved that the .22 caliber pistol had been destroyed in a furnace by the Houston Police Department on August 1, 1978. Appellant alleges that a new trial should be granted because although it is now known that the pistol had been destroyed, the jury had considered that it was the murder weapon; that the introduction of evidence concerning that weapon had denied him a fair and impartial trial; that the jury had discussed whether the appellant had had the pistol since 1971 without evidence of that fact; and that the jury had discussed that appellant was in a position to account for the whereabouts of the pistol and had not done so. The trial court overruled appellant's motion for new trial.

■ There is no allegation that the report of the destruction of the gun was purposely concealed or known by either prosecution or the defense at the time of the trial. In order to obtain a new trial based upon newly-discovered or newly-acquired evidence the record must reflect that:

1. The newly-discovered evidence was unknown to the movant at the time of his trial;

2. The movant's failure to discover the evidence was not due to his want of diligence;

3. The materiality of the evidence is such as would probably bring about a different result on another trial; and

4. The evidence is admissable and not merely cumulative, corroborative, collateral, or impeaching.

*Etter v. State,* 629 S.W.2d 839, 841 (Tex. App.—Houston [14th Dist.] 1982); *Whitmore v. State,* 570 S.W.2d 889, 896 (Tex.Cr. App.1978).

■ By appellant's own testimony at the punishment stage, the affidavit of his son and the affidavit of a close friend, the pistol had not been in appellant's possession since the time of his trial in 1972. The pistol had been given to appellant's attorney in the 1972 trial. There was no attempt to introduce the testimony of any of those persons. Even though the gun had been destroyed, the appellant was in the best position to prove that he was no longer in possession of the gun. That failure undermines the second prerequisite, that appellant must have exhibited due diligence in discovering the alleged newly discovered evidence. Further, a careful review of the record convinces us that the newly discovered evidence was not of such materiality as to probably produce a different result at another trial. *Etter, supra; Van Byrd v. State,* 605 S.W.2d 265 (Tex.Cr.App.1980). We cannot say that the trial judge abused his discretion in refusing to grant a new trial. *See Houston v. State,* No. A14–81–241–CR (Tex.App.—Houston [14th Dist.] May 13, 1982); *Washington v. State,* 642 S.W.2d 194 (Tex.App.—Houston [14th Dist.] 1982).

By his sixth ground of error, the appellant alleges that the trial court's charge was fundamentally defective in that it failed to require the jury to find that appellant shot the deceased. Omitting the formal parts, the two paragraph indictment alleged the appellant

. . . did then and there unlawfully intentionally and knowingly cause the death of James Willie Baines, hereafter styled Complainant, *by shooting him* with a firearm.

. . . did then and there unlawfully intend to cause serious bodily injury to James

Willie Baines, hereafter styled the Complainant, and did cause the death of Complainant by committing an act clearly dangerous to human life, namely by shooting him with a firearm . . .

The charging paragraph of the trial court's charge read as follows:

Now if you should find and believe from the evidence beyond a reasonable doubt that on or about the 1st day of November 1979, in Harris County, Texas, the defendant, Robert Lee Pierson, Sr. did intentionally or knowingly cause the death of James Willie Baines by shooting him with a firearm, or did then and there, with intent to cause James Willie Baines serious bodily injury, *shoot at him* with a firearm, and that such act was clearly dangerous to human life and caused the death of James Willie Baines, as alleged in the indictment, then you will find the defendant guilty of murder.

The appellant alleges that the prosecution was required to prove that James Willie Baines was shot with a firearm. However, the appellant complains that the charge permitted the jury to convict the appellant on proof different from and less than that required by the allegations and indictment: shooting *at* the deceased rather than actually shooting him. There was no objection to the charge.

■ A jury charge which totally fails to apply the law concerning the offense to the facts of the case is fundamentally defective and may be raised on appeal for the first time. *Perez v. State,* 537 S.W.2d 455 (Tex.Cr.App.1974); *Harris v. State,* 522 S.W.2d 199 (Tex.Cr.App.1973). In the instant case, the charge set forth the statutory elements of the offense and applied those elements to the facts of the case. We cannot conclude that the inclusion of the word "at" in the charge was error calculated to injure the rights of appellant or that appellant's trial was not fair and impartial as a result of the addition. Tex.Code Crim. Pro.Ann. art. 36.19 (Vernon 1973). The charge requires the jury to find that the act of shooting at the deceased caused his death. There was no evidence to indicate

that the deceased might have died as a result of having been shot at without having been hit. Absent an objection to the charge, we find no reversible error. Appellant's sixth ground of error is overruled.

■ By his grounds of error seven through fourteen, the appellant complains that he was denied effective assistance of counsel. The standard for such is as follows:

1. Effectiveness of both appointed and retained counsel are to be judged by the single standard of "reasonable effective assistance of counsel."

2. Such standard does not mean errorless counsel and not counsel judged ineffective by hindsight, but counsel reasonably likely to render, and rendering reasonable effective assistance. The fact that other counsel would have tried the case differently does not show inadequate representation.

3. Each case must be considered in light of its particular circumstances.

4. The adequacy of representation must be gauged by the totality of the representation.

*Robertson v. State,* 632 S.W.2d 805 (Tex. App.—Houston [14th Dist.] 1982); *See Humber v. State,* 624 S.W.2d 814 (Tex.App. —Houston [14th Dist.] 1981); *Williams v. State,* 513 S.W.2d 54 (Tex.Cr.App.1974); *Ewing v. State,* 549 S.W.2d 392 (Tex.Cr. App.1977); *Passmore v. State,* 617 S.W.2d 682 (Tex.Cr.App.1981) (concurring opinion, Clinton, n. 11); *Johnson v. State,* 614 S.W.2d 148 (Tex.Cr.App.1981); *Romo v. State,* 631 S.W.2d 504 (Tex.Cr.App.1982).

■ Applying the principles, we do not find that there was ineffective assistance of counsel in this case. Appellant's remaining grounds of error are overruled.

The conviction is affirmed.

MURPHY, Justice, dissenting.

I respectfully dissent from the majority decision. My concern with the disposition of this case is primarily founded upon ap-

pellant's assertions in regard to prosecutional misconduct during jury argument and denial of his motion for new trial based upon newly discovered evidence.

In jury argument, the district attorney repeatedly emphasized appellant's having owned a .22 pistol, that he had been seen "with a big gun" and the fact that "obviously" no .22 firearm was found by police at his residence after the event at issue. I disagree with the majority that the cumulative effect of this argument was not a wilful and calculated effort to make the jury believe appellant killed the deceased with a .22 caliber gun which he clandestinely disposed of prior to the police arrival at the scene. In fact, the obvious discrepancies in the witnesses' description of the purported murder weapon, the lack of proof of appellant's adapting his other guns for the purpose of using .22 caliber bullets, and the pathologist's surmise that the multilated remains of the bullet "were consistent with" a .22 caliber bullet should not be viewed as an exclusion of other reasonable hypotheses of guilt. *See, Nathan v. State,* 611 S.W.2d 69 (Tex.Cr.App.1981). The prosecutor did not point to or even attempt to disclose the discrepancies between his alleged "murder weapon theory" and appellant's purported .22 gun. I think this omission and the cumulative effect of the prosecutor's inferences and insinuations in regard to the .22 firearm materially affected the determination of appellant's guilt and hence the outcome of the trial, which resulted in a denial of a fair trial as outlined in *United States v. Agurs,* 427 U.S. 97, 112–113, 96 S.Ct. 2392, 2401–2402, 49 L.Ed.2d 342 (1976). See also, *Green v. State,* 587 S.W.2d 167 (Tex.Cr.App. 1979).

The trial court's denial of a new trial based upon newly discovered evidence causes me the same concerns I discussed in my dissenting opinion in *Etter v. State,* 629 S.W.2d 839 (Tex.App.—Houston [14th Dist.] 1982). The majority once again places an unsurmountable burden upon an appellant to prove exercise of diligence under the *Whitmore* test. *Whitmore v. State,* 570 S.W.2d 889 (Tex.Cr.App.1978). The majority points to appellant's failure to prove he no longer owned the gun as a lack of diligence justifying the denial of a new trial. The record reflects, however, that the state introduced its evidence in regard to the .22 firearm at the end of the trial and both sides rested immediately afterward. The prosecutor's jury argument the next day was composed in great part of the insinuations described above based upon that evidence. There was no way, therefore, for appellant to ascertain the source of the state's evidence until the end of his trial. The state of the record and the fact that after the trial appellant had ascertained that the Houston Police Department had destroyed that firearm prior to the events at issue is new evidence which would have refuted the prosecutor's insinuations, would have supported a new trial under *Whitmore* and would have contradicted the prosecutor's "murder weapon theory." Moreover, the refutation of that theory would certainly have had a material effect upon the outcome of the trial. See *Etter, supra,* at 841; *Whitmore, supra,* at 896. *Cf., Van Byrd v. State,* 605 S.W.2d 265, 267 (Tex.Cr. App.1980). In light of the unfair effect of the prosecutor's argument and the fact that there was newly discovered evidence perhaps critical to the outcome of the trial, I find the trial court's denial of a new trial was an abuse of discretion and would reverse and remand this cause for a new trial.